C. C. Cooke v. Commissioner.
Cooke v. Commissioner
Docket No. 20004.
United States Tax Court
1951 Tax Ct. Memo LEXIS 102; 10 T.C.M. (CCH) 881; T.C.M. (RIA) 51277; September 13, 1951
John H. Cantrell, Esq., and Edward M. Box, Esq., for the petitioner. E. G. Sievers, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves deficiencies in income tax and fraud penalties for the calendar years 1941, 1942 and 1943 as follows: Year
Deficiency
Penalty
1941
$ 47,841.52
$23,920.76
1942
180,973.15
90,486.58
1943
11,996.00
42,927.40
Totals
$240,810.67
$157,334.74
Issues raised by the pleadings and not conceded by petitioner or respondent at the hearing or on brief are: 1. Whether error was committed in disallowing as deductions in 1941 and 1942 the amounts of $63,228.34 and $118,907.90, respectively, which amounts were credited to accounts of certain employees of petitioner. *103 2. Whether petitioner is taxable on all of the profits of C. C. Cooke Co. for the year 1943 or only on one-half thereof as a member of a partnership operating the business. 3. Whether petitioner is entitled to deduct in 1941 the amount of $2,115.04 as a bad debt. 4. Whether the additional amount of $1,800 is deductible in 1943 for traveling expenses. 5. Whether the amount of $2,745 is deductible in 1943 as a loss sustained in the operation of a chicken farm. 6. Whether any part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. Petitioner filed his returns for the taxable years with the collector for the district of Oklahoma. Findings of Fact Petitioner has been engaged in roofing and sheet metal work for commercial buildings since 1908. The business was conducted in corporate form in Oklahoma City, Oklahoma, from 1928 until about 1930, when he started to operate in an individual capacity under the trade name of C. C. Cooke Co., hereinafter referred to as the "Company." In 1941 the Company, Standard Roofing and Material Co., a corporation, and Swanda Brothers, a partnership, both of which were competitors of the Company in Oklahoma *104 City, formed The Associated Companies of Roofing and Sheet Metal Contractors, hereinafter referred to as the "Associated Companies," as a joint venture to acquire and carry out war contracts by use of their joint facilities, any profits of the joint venture to be shared equally by the members thereof. The Associated Companies as prime contractors or subcontractors carried out several contracts for roofing and sheet metal work at Ft. Riley and Wichita Falls, which were completed during the first half of 1942, and Camp Gruber, which was started after the contract at Wichita Falls was completed. Petitioner assisted in setting salaries to be paid, on a basis of fair compensation as paid in the industry, key employees of Associated Companies. In 1930 the Company had two key employees, J. C. Leister and C. E. Hodges. A key employee is one who receives steady wages even though there is not at all times work for him to perform. The next key employee, J. P. Ground, was hired in 1933. Petitioner's son, Clint C. Cooke, Jr., born in 1915, became a key employee in 1935 or 1936 and Charles H. DeLaughter in February 1939. During the early 30's roofing and sheet metal work was scarce. The filing *105 of low bids was necessary to obtain contracts for work. Competition being keen, it was difficult for petitioner to keep his organization together and in doing so, he could not pay high wages to his employees. For the years 1931 to 1940, inclusive, the Company had the following profits or losses: 1931
$3,733.42
1932
3,820.01 [1]
1933
3,991.48 [1]
1934
4,208.87
1935
6,336.04
1936
$ 5,361.33
1937
6,834.36
1938
10,202.99
1939
10,861.74
1940
5,260.95
In or prior to 1936 petitioner appointed Leister manager of the Texas branch of his business, which was located at San Antonio, and agreed to pay him for his services a salary and a percentage of earnings. The other key employees were aware of the arrangement petitioner made with Leister to compensate him for his services. Petitioner solicited business for the Company, did all of its promotional work on the outside and had general supervision over its activities. The total straight salary paid by the Company to the key employees for the years shown was as follows: Year
Ground
Hodges [1]
Cooke, Jr.
DeLaughter
1933
$ 520.01
1934
422,83
1935
1,148.63
1936
2,030.00
1937
2,080.00
$2,111.89
$ 900.00
1938
2,390.00
1,896.50
1,275.00
1939
2,650.00
2,275.00
1,300.00
$1,150.00
1940
2,650.00
2,716.00
3,925.00
1,614.00
1941
2,600.00
3,146.25
5,200.00
2,127.59
1942
2,600.00
5,200.00
1,300.00
*106 In addition thereto they received the following additional amounts, omitting cents, from the sources shown: Ground
Hodges
DeLaughter
Cooke, Jr.
1941
1942
1941
1942
1942
1942
Company - Bonus
$3,900
$4,375
$ 750
$ 750
$2,050
Manhattan-Long Construction Co.
275
387
1,050
2,200
Associated Companies
5,300
2,980
1,715
$7,241
Hodges started to work for petitioner in 1928 as a sheet and metal apprentice and has worked for him at all times important since then, except for work performed for the Manhattan-Long Construction Co. and Associated Companies in 1941 and 1942. Thereafter he worked as a mechanic, roofer and did any other work assigned to him, including supervision of construction projects. He was a willing worker and at times worked long hours. Except for periods in 1941 and 1942, when he did some work for the Associated Companies and the Manhattan-Long Construction Co. for about three months by permission of petitioner, Ground has at all times important worked for the Company. He started as a laborer. In 1939 and thereafter he prepared estimates *107 for jobs, made up lists of materials to be purchased, supervised operations in the plant, took measurements for and acted as superintendent of projects, supervised the fabrication of material to be erected on jobs, and was in general charge of the Company's business in the absence of petitioner. Cooke, Jr., studied engineering at college for two and one-half years. He started to perform service for petitioner at odd times when he was 10 years old and by 1936 had considerable knowledge of petitioner's business. In September 1939 Cooke, Jr., accompanied his father to Honolulu and while there had charge of three jobs being carried out by petitioner at Schofield Barracks and Hickham Field. Upon his return from Honolulu about February 1940, Cooke, Jr., was placed in charge of a contract being carried out at Ft. Riley, and thereafter a contract at Camp Gruber. His services were similar to those rendered by Ground. Cooke, Jr., entered the military service on September 15, 1942, and was discharged therefrom in February 1946. DeLaughter's duties consisted of keeping the Company's books and records, preparing tax returns, doing stenographic work, loading and unloading material at the plant *108 when his assistance was necessary, and other necessary work at the plant that he could perform. He worked about 9 hours a day, six days a week, and when necessary at nights and on Sundays. His position could have been filled by any bookkeeper at the salary he was receiving. When necessary, all of the key employees worked long hours. They were at all times paid salaries and bonuses comparable with those paid by other organizations similar to that of the petitioner. In July 1941 petitioner requested DeLaughter to ascertain whether applicable revenue acts prohibited petitioner from obtaining deductions for amounts that he might distribute under a plan to share profits of his business with his key employees. [1] After examining the question, DeLaughter informed petitioner that he found nothing against the deductibility of amounts paid under a plan of that character. The Company had profits of $126,456.66 in 1941. In 1942 prior to February 18, after DeLaughter had determined the earnings of the *109 Company for 1941, petitioner directed DeLaughter to credit 20 per cent of the total profits to accounts of Cooke, Jr., and Ground and 5 per cent to Hodges and DeLaughter. Petitioner intended that the amounts should include compensation paid to them in 1941 for services. The next day petitioner directed DeLaughter to increase the amount of the credit to Hodges to 10 per cent and not to make a credit to his account. Later that day DeLaughter made the necessary entries in the books as of December 31, 1941. The entry was made by charging salary expenses with $63,228.34 and crediting accounts of the key employees with a like amount - $25,291.34 to the accounts of Cooke, Jr., and Ground and $12,645.66 to the account of Hodges. The explanation for the entry classifies the amounts as distributions of profit in accordance with an agreement of January 1, 1941, without any statement that it was additional compensation for services of prior years. No deductions were made for salaries in computing the amounts. Upon ascertaining the error petitioner decided not to adjust the credits. The key employees were on the cash basis of reporting income. The amounts credited to their accounts were reported *110 as income from personal services in Federal and Oklahoma State returns filed by them for 1941. The returns were prepared by DeLaughter. The return of petitioner for 1941, filed on the accrual basis of accounting, reported $63,228.32 as income from the Company, including $9,124.39 from the Texas branch of the Company. In the computation of the amount petitioner deducted for salaries the amount of $71,045.43, which includes the total amount of $63,228.34 which was credited to the accounts of Cooke, Jr., Ground and Hodges. The balance in the checking account of he Company in the Liberty National Bank on the dates shown was as follows: January 1, 1942
$ 16,200.86
January 31, 1942
23,966.82
February 28, 1942
15,229.41
March 31, 1942
6,251.76
April 30, 1942
855.65
May 31, 1942
71,466.61
June 30, 1942
48,707.19
July 31, 1942
143,749.46
August 31, 1942
169,583.49
September 30, 1942
131,985.82
October 31, 1942
121,112.08
November 30, 1942
81,683.59 It had other bank accounts but the balances in them were small in comparison with the account in the Liberty National Bank. On February 20, 1942, DeLaughter prepared a financial statement of the Company *111 as of December 31, 1941, and did not include therein as liabilities the $63,228.34 credited to the accounts of key employees. The statement contained a certificate for the signature of DeLaughter that he had charge of the books of the Company and that the statement was prepared by him as a true reflection of petitioner's business as of December 31, 1941. A copy of the statement was submitted to Dun & Bradstreet. On February 17, 1943, a revenue agent requested DeLaughter to furnish him a copy of the statement. DeLaughter expressed to the revenue agent a desire to make a notation on the statement and a few minutes thereafter delivered a copy to him bearing a notation to the effect that the statement was prepared for the purpose of filing it with a bonding company to secure a performance bond, that the books had not been completely closed and that several adjustments would be necessary to make the financial statement agree with the books. On January 26, 1942, the Company filed Form 940 under the Federal Unemployment Tax Act in which it reported payments of $57,778.04 for salaries, wages, and other remuneration paid during 1941. On February 4, 1942, petitioner filed Form 1096, annual *112 information return, for 1941. He prepared and filed Form 1099 in which he reported the payment of $5,200 and $6,500 as salaries, wages, fees, commissions and bonuses to Cooke, Jr., and Ground, respectively, in 1941. A short time before he entered the military service in September 1942 Cooke, Jr., and his father discussed the method of investing the amount credited to his account in some form of quick assets, insurance on petitioner's life with Cooke, Jr., as beneficiary, and bonds and stocks being mentioned, and Cooke, Jr., told petitioner to use his own judgment in the matter. In October 1942 petitioner had issued to him by two life insurance companies a total of $45,000 single premium 20-year endowment insurance policies on his own life. The insured's wife was named beneficiary, with Cooke, Jr., and Warren B. Cooke, a son of petitioner, as contingent beneficiaries, in $20,000 of the insurance and the sole beneficiary of another policy for $5,000, and the two sons and two sisters of petitioner were designated as beneficiaries in the other policies, $5,000 for each. The insured had a right to change the beneficiaries of the policies. In November 1942 each son was named direct beneficiary, *113 with petitioner's wife and the other son as contingent beneficiaries, in a policy for $5,000 in lieu of petitioner's wife as direct beneficiary and Cooke, Jr., and Warren B. Cooke as contigent beneficiaries. Application was made on August 26, 1942, for three of the policies, totaling $20,000, and on October 7, 1942, for the other policies. Upon receipt of the policies, DeLaughter checked the amount of premiums through their transparent wrappers and placed them in a safe. The premiums on the policies, totaling $33,215.30, were paid on October 31, 1942, by two checks of the Company which were signed by petitioner and on each of which appeared a statement that it was drawn to pay the premiums and was to be charged to the account of Cooke, Jr. DeLaughter charged the amount of the premiums to Cooke, Jr.'s account. Cooke, Jr.'s account had a credit balance of $18,270.70 before the charge was made. In January 1943 during the course of the revenue agent's examination of petitioner's return for 1941, DeLaughter informed the revenue agent that the account of Cooke, Jr., contained an item "that he was somewhat at a loss to know how to enter at the time he made it." Later in the same day *114 the revenue agent ascertained that Cooke, Jr.'s account had been charged the amount of $33,215.30 for premiums on insurance on the life of petitioner. Upon the delivery of the policies to the revenue agent for his examination, DeLaughter learned for the first time that Cooke, Jr., was not the beneficiary of all the policies. DeLaughter advised the revenue agent that until that time, he had believed Cooke, Jr., was the beneficiary of the policies. Upon advising petitioner of the fact, petitioner, on January 8, 1943, informed DeLaughter that he intended to take the policies out for his own account and that the premiums should be charged to his account instead of to the account of Cooke, Jr. A correcting entry was made as of December 31, 1942. In his determination of the deficiency for 1941 the respondent found that petitioner had claimed as deductions a total of $78,330.93 for salaries, bonuses and distributions of profits to the key employees. He allowed $5,200 as salary for Cooke, Jr., and $4,928.75 for salary and bonus for Ground, $3,146.25 for Hodges and $1,827.59 for DeLaughter, a total of $15,102.59, and disallowed the remainder of $63,228.34 upon the ground that the entries *115 made for the amount "were made solely for the purpose of avoiding income tax and not for the purpose of setting up bona fide credits to your employees." He also held that if the credits were bona fide, the amount constituted excessive compensation and if the amount of $25,291.34 credited to Cooke, Jr., was a bona fide credit and represented reasonable compensation, it is not deductible because not paid during 1941 or within two and one-half months after the close thereof nor constructively received by Cooke, Jr., within the taxable year. As of November 1942 the books of the Company contained charges totaling $100,000 for bonuses for 1942, with a balancing credit to reserve for bonuses. On February 1, 1943, the Company filed Form 940 for the year 1942 in which it reported payments of $83,918.40 for services of employees. On February 8, 1943, DeLaughter informed the revenue agent during the course of his examination of petitioner's return for 1941 that there was no definite plan with respect to payment of bonuses set up on the books but that Cooke, Jr., and Ground were to share in it at a less percentage for 1942 than they had received out of profits for 1941, that Hodges would receive *116 the same percentage, and that he, DeLaughter, would receive some portion of the profits, the exact amount of which he did not know at that time. The tax on the net income reported by each key employee to the state of Oklahoma and the Federal Government for the years 1941, 1942 and 1943 was paid by check of the Company and charged to his account. Other charges to the accounts in 1942 and through June 1943 for withdrawals were as follows (cents omitted): Cooke,
De-
Ground
Jr.
Hodges
Laughter
1942
$1,033 [1]
$5,477 [2] $431
1943
n1
1,181
253 $15
About January 31, 1943, the Company filed with the collector Form 1096 for 1942 in which there was attached reports on Form 1099 showing payment of a salary of $5,200 to Cooke, Jr., and $1,750 to Hodges. In his return for 1942 Hodges did not report any salary or wages from the Company. The books of the Company for 1942 disclosed gross income of $461,790.96, job costs and general expenses of $163,084.87 and $152,468.16, respectively, and net profit *117 of $146,257.93. The general expenses included an item of $9,125 for office salaries, of which $1,300 of $1,325, $2,600 and $5,200 represent charges for salary to DeLaughter, Ground and Cooke, Jr., respectively; and $127,432.90 as a division of profits to the key employees in the following amounts: Cooke, Jr.
$51,783.16
Ground
50,433.16
Hodges
13,258.29
DeLaughter
11,958.29
Of the amount of $127,432.90, $118,907.90 was credited to accounts of the key employees as of December 31, 1942, as follows: Cooke, Jr.
Ground
Hodges
DeLaughter
Total
Profits
$53,033.16
$53,033.16
$13,258.29
$13,258.29
$132,582.90
Less: Salary
2,600.00
2,600.00
1,300.00
6,500.00
Christmas bonus
4,375.00
750.00
2,050.00
7,175.00
Credit
$50,433.16
$46,058.16
$12,508.29
$ 9,908.29
$118,907.90 The entry was explained in the books as being under the plan to share earnings with key employees the "same as in 1941," less "salaries and advances," 20 per cent each to Cooke, Jr., and Ground and 5 per cent each to Hodges and DeLaughter. No reference to payment for earlier years appears. The return of petitioner for 1942, filed on March 31, 1943, on *118 the accrual basis, reported net profit of $146,257.93 from the Company, computed in accordance with its books. In addition he reported $22,117.50 as one-half of the profits of the Texas branch and $5,200 as salary and other compensation for services, the source not being shown. In their Federal and state returns for 1942, which were prepared by DeLaughter, the employees reported the following amounts as gross income from salaries and wages and total taxes due on the net income: Ground
Cooke, Jr.
Hodges
DeLaughter
$ 8,287.50
$ 8,641.00
$ 4,830.00
$ 3,015.00
50,433.16 [1]
50,433.16 [1]
13,258.29 [1]
12,008.28 [1]
Total
$58,720.66
$59,074.16
$18,088.29
$15,023.28
Taxes due
$32,605.85
$34,619.91
$ 5,159.68
$ 4,548.80
On March 22, 1943, petitioner, designated as a "sole trader, doing business as C. C. Cooke Company," and Ground, Cooke, Jr., and Hodges executed an instrument in which they recited that at the beginning of 1941 they agreed that the employees should continue on substantially the same salary but that at the end of 1941 and for 1942 the compensation of Ground and Cooke, Jr. *119 , for 1941 should be fixed at 20 per cent of the net profits of the Company in addition to his drawing account and for 1942 at the same percentage but to include his drawing account, and that the compensation of Hodges at the end of 1941 should be 10 per cent of the net profits in addition to his drawing account and 5 per cent for the year 1942, the amount to include his drawing account. The instrument also recites that it was to evidence the agreement entered into and that it was not intended that the employees should in any way become interested in the business or property of the Company or in any way become partners. On the same day petitioner and DeLaughter executed a similar agreement providing that the latter's compensation "at the end of 1942" should be 5 per cent of the net profits of the Company, including his drawing account. In his return for 1941, Ground claimed the amount of $203.26 for interest paid to the Metropolitan Life Insurance Co. and in his return for 1942 he reported and deducted a payment of $213.74 to the "Midwest Mortgage Co. (Real Estate)" for interest. He had no loan on his home after 1941. In his returns for 1942 and 1943 DeLaughter claimed deductions *120 for interest as follows: 1942
1943
Liberty National Bank (Car
notes)
$70.00
Local Building & Loan (House
loan)
53.34
$209.27
Liberty National Bank (Est.)
23.30
Peoples Finance & Thrift Co.
10.00
The Company did not file in 1942 an application with the Salary Stabilization Board for payment of the bonuses. In his determination of the deficiency for 1942 respondent found that in addition to salary of $9,125 (consisting of $5,200, $2,600, $1,300 and $25 for Cooke, Jr., Ground, DeLaughter and "miscellaneous," respectively) petitioner deducted the Christmas bonuses, totaling $7,175, which were taken into account by the Company in arriving at the credits made to the accounts of Ground, Hodges and DeLaughter for profits, and $1,175 as a bonus for petitioner and $175 as a bonus to shop employees, a total of $8,525 for bonuses, and $118,907.90 for the profit sharing plan. The total amount for the bonuses and the profit sharing plan is $127,432.90, the amount claimed by petitioner for amounts paid to key employees under a profit sharing plan. The respondent disallowed the amount of $118,907.90 for the same reason given for disallowing the amount of $63,228.34 *121 claimed as a deduction for the year 1941 under a profit sharing plan; also the amount of $1,175 claimed as a deduction for bonus paid to petitioner. Respondent also increased the income of petitioner from the Associated Companies by $80,415.46, including $100 of salary, less $10,710.45 representing tax on excessive profits determined in renegotiation proceedings, a net amount of $69,805.01. No agreement was entered into by petitioner with his key employees for the payment to them, in addition to their regular salary, of amounts for services rendered based upon the profits of the Company in 1941 and 1942. The amounts credited to their accounts as of the close of 1941 and 1942 are in excess of reasonable salaries or compensation for services actually rendered. On March 24, 1943, petitioner and Ground executed an instrument in which it was recited that the value of the assets of the Company, less liabilities, was $281,831.30; that for a consideration of $56,366.26 petitioner was transferring to Ground a one-fifth interest in the assets of the Company; that there was credited on the books of the Company to the account of Ground $58,657.24 as his share of profits for 1941 and 1942 and *122 that of that amount, $26,051.39 was to be applied on the purchase and the remainder evidenced by a note payable by the application of 75 per cent of the annual profits distributable to the one-fifth interest being conveyed; and that in the event contracts performed during 1941 and 1942 by the Associated Companies were renegotiated and profits therefrom diminished, one-fifth thereof was to be charged against the interest being sold and purchased. On the same day like instruments, except as to amounts, were entered into by the petitioner and Cooke, Jr., Hodges and DeLaughter. The interest transferred and the amounts as recited therein were as follows: Purchase
Credits
Credits to
Interest
price
for profits [1]
be applied
Cooke, Jr.
1/5
$56,366.26
$67,505.84
$32,885.93
Hodges
1/20
14,091.57
20,634.16
14,091.47
DeLaughter
1/20
14,091.57
9,908.29
5,359.49
*123 Included in the value of $281,831.30 of net assets of the Company was the amount of $164,603.88 as the value of 1943 profits on jobs being carried out by the Associated Companies. On March 24, 1943, petitioner and the key employees executed an instrument reciting that they agreed to become partners to do business under the name of C. C. Cooke Company (the enterprise to be hereinafter referred to for identification purposes only as "partnership"); that the key employees had purchased interests in the business of petitioner for the amounts set forth in the preceding paragraph hereof, which interests, with the interest of petitioner, were contributed to the capital of the partnership, that petitioner as general manager of the partnership was to have full charge of all of the affairs of the partnership at a salary of $100 per week; that Cooke, Jr., was to be assistant general manager in full charge of all matters delegated to him at a salary of $75 per week; that Ground was to be assistant general manager and to have full charge of the shop in Oklahoma City and the affairs of the partnership in the absence of petitioner, for which he was to receive a salary of $75 per week; that Hodges, *124 under the title of field superintendent, was to be in charge of specific projects at a salary of $50 per week; and that DeLaughter, at a weekly salary of $50, was to have the position of accountant with full charge of the books and records of the partnership, which were to be open at all times to the inspection of the partners; that profits and losses of the partnership should be shared in proportion to the interests of each partner; that any wages or salaries earned by the partners for service outside of the partnership in excess of the salaries payable by the firm should be paid to the partnership; and that the arrangement was to become effective as of January 1, 1943, and continue for a period of 20 years unless sooner dissolved by agreement of the parties. On April 1, 1943, the partnership filed Form SS-1A for the first quarter of 1943 in which it reported the amounts of $325 and $650, respectively, as wages paid to DeLaughter and Ground. The same amounts were reported in its withholding tax return, Form V-1, filed on April 30, 1943, for the same period. In September 1944 it was determined under renegotiation that of the profits realized by the Associated Companies for the *125 calendar year 1942, $150,000 should be eliminated. The renegotiation agreement was signed by petitioner as sole owner of the Company. On September 10, 1948, a District Federal Court entered an order that each member of the Associated Companies was liable to the United States for $48,869.27 under the renegotiation, plus interest from September 7, 1948, the date of judgment, until paid. On September 27, 1948, C. C. Cooke Company issued its check for $45,769.01 in part payment of the judgment, that amount being the Company's share of the amount eliminated by renegotiation, less a credit for taxes, plus court costs and interest. On that date the account of petitioner on the books of C. C. Cooke Company was charged with one-half of $56,479.46, an amount representing the Company's share of the elimination and $6,479.46 for court costs and interest, and the account of each key employee was charged with his share of the remainder. About July 25, 1943, when revenue agent Cummings and special agent Roderick began their investigation of the return of petitioner for 1942, the books of the partnership did not disclose that the business was being operated at that time as a partnership. Information *126 that it was being so operated was volunteered by DeLaughter. In response to inquiries by Cummings, DeLaughter informed him that credit agencies, the bank and creditors had not been advised of the creation of a partnership for the business and that, so far as he knew, there had been no publication of it. Petitioner had informed DeLaughter that publicity of the matter was inadvisable in view of the good credit he was enjoying. A certificate signed by petitioner and the key employees that they had formed a partnership to do business under the firm name of C. C. Cooke Company, effective January 1, 1943, was published in a newspaper in Oklahoma City for 30 consecutive days commencing July 31, 1943, and about that time article of co-partnership were filed with the county clerk. The entries giving effect to the formation of a partnership were made in September 1943, at which time the accounts of the key employees in the books of the Company were charged and the account of petitioner was credited with the following amounts: Ground
$30,000.00
Cooke, Jr.
40,000.00
Hodges
14,091.50
DeLaughter
6,091.57 The title of each account of the key employees was, in addition to *127 the name of the individual, "Wages and Share of Profit Accrued." Each account for 1943 had an opening credit entry for the balance in the drawing account of the individual at the close of 1942. Charges and credits were made as of the close of each month during 1943 from journal entries. The postings in the accounts included, in addition to the charges for the alleged purchase from petitioner, amounts for income taxes of the individual, withdrawals, profits of the partnership and adjusting entries at the close of the year. The accounts had the following debit balances, respectively, at the close of 1943: Ground
$9,376.54
Cooke, Jr.
8,121.95
Hodges
1,403.31
DeLaughter
1,791.01
No cash was contributed by key employees in connection with the formation of the partnership. Ground, Hodges and DeLaughter performed services for the partnership in 1943. Ground discontinued performance of services for the partnership the latter part of 1948 and performed no services for it in 1949. Petitioner informed him that inasmuch as he had not performed any services for the partnership in 1949 that he was not entitled to any of its profits for that year. Petitioner consented *128 to an accounting after Ground had consulted an accountant or lawyer concerning the matter. In September 1947 Cooke, Jr., purchased the interest of Hodges in the partnership and in March 1950, effective as of December 31, 1948, Warren B. Cooke purchased the interest of Ground. No partnership agreement was entered into after the acquisitions. Hodges and Ground have been paid in full for the interest they sold. The partnership filed a return for 1943 in which profits of $178,323.40, including $167,361.48 from the Associated Companies, were reported. Thereafter, in May 1944 it filed an amended return in which profits of $13,719.52 were reported. The reduction of $164,603.88 in the amount of profits resulted from an elimination of that amount of income from the Associated Companies. One-fifth, or $32,920.78, of the amount eliminated was charged to each of the drawing accounts of Ground and Cooke, Jr., and one-twentieth, or $8,230.19, to each of like accounts of Hodges and DeLaughter. The returns reported the profit to be distributable as follows: Original
Amended
Petitioner
$86,896.70
$4,594.76
Cooke, Jr.
38,658.68
5,737.90
Ground
33,540.28
619.50
DeLaughter
9,981.47
1,751.28
Hodges
9,246.27
1,016.08
*129 The amended partnership return reported salaries paid to partners and receipts by them from the Associated Companies as follows: Associated
Partnership
Companies
Petitioner
$ 5,200.00
$ 5,200.00
Cooke, Jr.
3,900.00
Ground
3,981.60
5,200.00
Hodges
2,681.60
2,125.00
DeLaughter
2,691.80
1,400.00
Total
$18,455.00
$13,925.00 The amount of $13,925 was treated as partnership income in arriving at net income of the partnership. The key employees filed Federal and Oklahoma income tax returns for 1943, prepared by DeLaughter, in which they reported wages and profits from the partnership as follows: Cooke, Jr.
Ground
Hodges
DeLaughter
U.S. Army
$ 1,200.00
Partnership
38,658.68
$33,540.28
$ 9,246.27
$ 9,981.47
Associated Cos.
5,200.00
2,175.00
1,400.00
C. C. Cooke Co.
96.60 DeLaughter filed an amended Federal income tax return in which he reported his share of the profits of the partnership to be $1,751.28. The petitioner reported in his original income tax return for 1943 the amount of $86,896.70 as his share of the profits of the partnership. His amended return for that year, prepared in May 1944, *130 included $4,594.76 as his share of the profits of the partnership and $167,361.48, less $2,757.60, representing profits to the partnership on the excess of receipts over the valuation placed on the assets in the sale by petitioner to the key employees, a net of $164,603.88, from the Associated Companies. The amended return reported the sale of a one-half interest in his Oklahoma City business for $140,915.66, an amount equal to his basis in the interest sold. Included in the basis for the assets of his business was the amount of $164,603.88 for the value of 1943 profits on jobs being carried out by the Associated Companies. In his determination of the deficiency for 1943 respondent held that petitioner was the sole owner of C. C. Cooke Company and taxed him on the profits of $13,719.52 reported by the partnership. He also determined that petitioner's share of the profits of the Associated Companies was $166,256.35, which amount included the $80,415.46 included in income in 1942. The amount of $80,415.46 was included in income in each of the years 1942 and 1943 for protective purposes. Federal and Oklahoma state partnership returns were filed in the name of C. C. Cooke Company for *131 1944 to 1947, inclusive. No partnership existed among petitioner and the key employees during the year 1943 for Federal income tax purposes. Commencing about 1932 the Company charged amounts to Dan Tankersley and the Tankersley Construction Co. in an open account for material furnished to or services performed for them. The last charge was made on April 1, 1939. A partnership and a corporation operated under the name of Tankersley Construction Co., both of which were involved in the account. The corporation took over the business of the partnership, in connection with which Dan Tankersley assumed the debt. In September 1939 an agreement was reached that the amount owed under the account was $2,507.04, of which $384.50 and $7.50 were subsequently paid, leaving a balance of $2,115.04. Dan Tankersley and his brother, who had interests in the Tankersley Construction Co., discontinued business relations in 1941, and thereafter Dan Tankersley informed the Company that neither he nor the corporation would pay the account. Thereafter in 1941 petitioner charged off the account as worthless on the basis of a statement of Dan Tankersley that neither he nor the Tankersley Construction Co. *132 owed the amount and that he would not pay it, and a determination of the Company that collection might be barred by the statute of limitations. In October 1944 petitioner filed suit against Dan Tankersley for recovery of the debt, alleged therein to be in the amount of $2,122.54. It was alleged in the petition instituting the action that the debt was originally owed by the Tankersley Construction Co., a corporation, and that on March 2, 1942, the defendant agreed to pay the debt. A jury found for the defendant on April 17, 1947. In his determination of the deficiency for 1941 respondent disallowed a bad debt deduction of $2,115.04, for the account upon the ground that the account did not represent a debt owed by the Tankersley Construction Co. and, in the alternative, in the event it should be held that the account constituted a debt of the Tankersley Construction Co., that the account was "no more worthless at the end of 1941" than it was "at the beginning of that year." Upon the completion of the job at Camp Gruber about May 1, 1943, it was necessary for petitioner to travel in Texas to look for work. Petitioner used his own money to pay expenses incurred during the course *133 of traveling but kept no record of his expenditures. He estimated that his traveling expenses in 1943 were $2,400, which was about the same as his estimates in prior years for traveling expenses incurred in operating his business. The only deduction petitioner claimed in his return for 1941 for traveling expenses was the amount of $2,122.92, which amount he deducted in computing the profits of his business in Oklahoma City. In determining the profits in 1942 of his business in Oklahoma City, petitioner deducted $943.17 for traveling expenses, and in addition thereto he deducted as other deductions authorized by law the amount of $1,252.32 for "Traveling Expenses on Business, not reimbursed by Company Account." The return filed in 1943 on Form 1065 by C. C. Cooke Company as a partnership contained a deduction of $444.12 for traveling expenses. The petitioner claimed in his return for 1943 a deduction of $2,400 for traveling expenses for which he received "no reimbursement." In his determination of the deficiency for 1943 respondent, without submission by petitioner of any information to substantiate the deduction, allowed $600 of the amount as a reasonable allowance and disallowed *134 the remainder. In 1941 or 1942 petitioner acquired a one-half interest in a game chicken ranch, known as the Lawridge Plantation, at Miccosukee, Florida. The fowl were raised and sold for cock fighting purposes. The chickens, including pullets, were sold for an average of $15 each. The operators of the ranch entered some of the fowl in cock fighting tournaments held in Florida probably four times each year. Each participant deposited a forfeit of $500 in a pool for distribution among the owners of the top three winners. In 1943 the ranch property was sold and the chickens were moved to another tract. Part of the method used by the operators of the ranch to raise game cocks for sale was to isolate them from all other chickens on farms for a period of one year when they became ten months old. Farmers were paid $10 per fowl for keeping them during the isolation period. The petitioner claimed in his return for 1943 a loss of $2,745 from the operation of the Lawridge Plantation. Gross income from the operation of the ranch was reported to be $1,055 from the sale of game fowl and $750 from "Tallahassee Purse." Operating expenses claimed in arriving at the loss included $300.80 for *135 depreciation on a garage apartment, two tenant houses, barns and stables acquired January 1943, $606.75 for country walks, payments to farmers for isolating fowl) and $502.02 for repairs to training quarters. Respondent disallowed the loss deduction upon the ground that the farm was operated for pleasure. He further determined that in the event it should be held the operation was not for pleasure that the loss is not deductible on account of having resulted from the operation of the illegal business of cock fighting, and if it is held that the loss did not result from either of the two grounds, that the item of depreciation is applicable to petitioner's personal residence and that the items of $606.75 and $502.02 constitute capital expenditures. Opinion Salary Deduction Issue The broad question respecting the issue involving credits to key employees of profits earned by the Company in 1941 and 1942 is whether the amounts constitute ordinary and necessary business expenses within the meaning of section 23 (a) (1) (A) of the Internal Revenue Code. Such expenses include "a reasonable allowance for salaries or other compensation for personal services actually *136 rendered." Respondent argues that there was no previous commitment to share the profits and that the sole purpose of the credits was to form a basis for deductions to evade taxes. Thus, at the outset we are met with the charge that the plan lacked reality. This has required detailed consideration of the voluminous evidence on the point. Petitioner's theory, in general, is that to save his business organization during years when he could not pay his key employees adequate compensation for their services, he committed himself to share profits with them on a 50-50 basis effective when he had profitable years, provided they remained with him to keep the enterprise together and helped produce the anticipated profits, and that pursuant thereto in 1940 the promises were made specific by a legally enforceable agreement that the years would be 1941 and 1942, except that DeLaughter was excluded in 1941 with his consent. The additional compensation credited to the accounts of key employees on the basis of profits realized in 1941 and 1942 is alleged to represent deferred or delayed contingent compensation for services rendered during the entire period of their respective employment. To support *137 his contention that a binding obligation existed to share profits, petitioner cites testimony of himself and the key employees. The testimony contains inconsistencies and in some respects is inconsistent likewise with other evidence. Cooke, Jr., testified that in and subsequent to 1936 petitioner informed the key employees, in effect, that if they remained in his employ at the compensation then being paid to them for their services, profits of the business would be shared with them on the basis of their effort when the Company could pay it. He also testified that about July 1940 petitioner realized that he would have a profitable year but if the key employees would permit him to retain all of the earnings to pay off obligations, he would carry out the agreement for the next two years, to which the employees agreed. According to other testimony by Cooke, Jr., petitioner informed them again in December 1940 that they would share in the profits of future years. He referred in some of his testimony to specific members of the group of key employees who were present when the alleged promises were made by petitioner. The testimony of Cooke, Jr., loses much of its weight when considered *138 with what he said in an affidavit he gave a special agent on February 24, 1943, in connection with an investigation being made of petitioner's 1941 return. A statement appears therein that during 1941 he had various conversations with his father; that they believed 1941 would be a profitable year; that if the "year's business proved profitable, that the company would pay me a bonus in addition to the salary paid me"; that he could not recall any specific date or dates when petitioner promised to pay him a "bonus"; that there might have been others present when the payment of a "bonus" was discussed but that he could not recall anyone else; that the "bonus" credited to him for 1941 was about $25,000 but that he could not recall the percentage of the profits the amount represented. DeLaughter's testimony respecting the July 1940 meeting with the key employees is to the same general effect as that of Cooke, Jr. In addition he testified that petitioner said that he would "split the profits with you [the key employees] down the middle in '41 and '42." This testimony, without more, is that in July 1940 the key employees, in consideration of their promise to forego receiving a share of *139 the profits of 1940, would receive one-half of the profits earned in 1941 and 1942, and assumes a binding agreement previously entered into. DeLaughter further testified that until July 1941 there was no discussion about how one-half of the profits would be divided among the key employees, except that allocations would be based upon length of service, their work and the responsibility they assumed and that the percentages would be determined at a later date. The percentages, according to DeLaughter's testimony, were not fixed until the early part of February 1942, when petitioner decided to assign 20 per cent each to Ground and Cooke, Jr., and 5 per cent each to Hodges and DeLaughter, and decided the next day to increase Hodges' share to 10 per cent by eliminting DeLaughter from the list, the latter to share in the profits the next year. The sworn statement DeLaughter made on February 6, 1943, to Special Agent Roderick and Revenue Agent Young, who examined petitioner's return for 1941, regarding entries made by him for distribution of profits, is that Ground had told him in February 1939 that he had started on a low salary because he was sure petitioner would eventually make some *140 money from the operation of his business or that he would be taken into the business later on; that petitioner had informed him numerous times that he had planned to take care of Ground, Cooke, Jr., and Hodges and that if he remained with him and became convinced that "I was his man" that he would be placed in their status. He also said that in June 1941 petitioner told him that the year 1941 appeared to be the one out of the profits of which he could "repay his boys for staying with him over the rough places" and that shortly after the close of that year, the percentages of profits for the key employees were fixed by petitioner. He stated also that after closing the books for 1940 petitioner informed him that if the profits in 1941 were as high as it appeared that they would be, that he would be able to "take care of his boys" as he had planned and that he had "more or less" agreed that it would be done in 1941; that it was understood on January 1, 1941, without a definite agreement, that the plan would be effective for that year and that the probable reason for selecting January 1, 1941, as the date of the agreement when making the entries for the 1941 profits was that it made a *141 "break from 1940 to the 1941 accounts." Nothing in the statement of DeLaughter indicates any definite promise on the part of petitioner prior to the early part of 1942 for sharing 1941 earnings, neither does it show any general discussion of the matter by petitioner with the employees or among the latter prior to the time petitioner fixed the percentages and in that respect is contrary to the testimony of Cooke, Jr., and DeLaugher before us. In February 1943 DeLaughter informed a revenue agent that no definite plan existed for payment of the "bonuses" set up on the books out of anticipated profits. The alleged oral agreement was reduced to writing on March 22, 1943, after the examination of petitioner's return for 1941 was started. The written agreement between petitioner and Ground, Cooke, Jr., and Hodges recites that the division of profits for 1941 and 1942 among those concerned was agreed to "At the beginning of 1941 * * *." Cooke, Jr., testified that the agreement erroneously recites the date when the percentages for a division of the profits were fixed and that the ratios were determined in February 1942 for 1941 profits. The written agreement entered into with DeLaughter recites *142 "the beginning of 1942" as the time of the agreement fixing his compensation at the end of 1942 as 5 per cent of the profits for that year. The testimony of DeLaughter is that in February 1942 petitioner requested him to forego his participation until the year 1942 and DeLaughter's statement before the special agent and revenue agent is that he agreed to his elimination from the list for 1941 profits "on the basis that he would take care of me later on in whatever amount he saw fit." Petitioner testified that he had various conversations with his key employees from 1936 through 1942 with respect to the future formation of a "partnership"; that about July 1940 he informed the key employees at a meeting of all of them that if they would let him have all of the profits earned in 1940 that he would "split" the profits of the years 1941 and 1942 with them, to which they agreed; that the matter was discussed with them again in December 1940; that about July 1941 he had told the employees that he would divide 50 per cent of the profits among them without specifying the percentage each would receive; and that after the profits for 1941 were determined, he informed DeLaughter how he wanted *143 the profits divided. This testimony recites a definite promise in July 1940 to split the profits of 1941 and 1942. His testimony before Special Agent Roderick and Revenue Agent Hartson on February 25, 1943, was that on or about January 1, 1941, he talked to all of the employees, but not in a group and could recall only one specific instance when the matter was discussed and that that conversation was with Ground, the approximate time of which he could not recall. He also testified that conversations with Ground and Hodges about the matter had been going on for five or six years. Hodges testified that after Leister went to Texas petitioner "told us that when he made it we would make it, and he repeatedly told us that time and again"; and that in 1940 petitioner said he would split the profits earned in 1941 in 1942. Statements in the affidavit which Hodges signed on February 3, 1943, in connection with the revenue agent's examination of petitioner's return for 1941 are no more than that during the ten years prior thereto petitioner informed him and Ground that it was his intention to have him and Ground become partners whenever the business became sufficiently profitable; that in *144 November or December 1941 petitioner informed him that he planned to award 10 per cent of the profits realized in 1941 to him, 20 per cent each to Ground and Cooke, Jr. Ground testified that petitioner informed him after Leister went to Texas "that if I stayed with the Company that I would be taken care of"; and that thereafter petitioner assured him that "If the Company made any money I would make some money." He testified before Special Agent Roderick and Revenue Agent Young on February 5, 1943, that he discussed the matter with petitioner in 1936 or 1937 and again in 1940; also, that in 1941 petitioner told him that it looked like he would be taken care of out of the profits of that year; that during the discussions petitioner did not indicate the percentage of profits that would be allocated to him; that he did not know until February 1942 that he would receive a "bonus" out of profits of 1941; and that he did not at any time prior thereto have a definite agreement with petitioner for the payment of a bonus to him. Aside from this conflicting and contradictory evidence there is other evidence tending to establish lack of a real agreement or promise on the part of petitioner *145 to pay the additional compensation. That petitioner did not consider that he was obligated to share the profits of 1941 with DeLaughter is definitely shown by the fact that he first allocated 5 per cent thereof to him and then withdrew it the next day. Testimony that DeLaughter agreed to the elimination has little weight when considered in the light of petitioner's testimony before a special agent and revenue agent that DeLaughter's position "could be filled with any bookkeeper at the salaries that he was receiving" and that he suggested to DeLaughter that he "would make further compensation with him later on." Petitioner's argument is based upon an alleged agreement with his key employees "to split the profits down the middle" and "divide with them 50-50" and a contention that he kept his promise. According to testimony, salary received by the participants in 1941 was to be taken into account. The agreement of March 22, 1943, so provides for 1941, but that the division for 1942 should include the drawing accounts of the employees. The credits for 1941 profits, made before the written agreement was entered into, disregarded salaries and bonuses totaling $15,596.25 and petitioner *146 made no adjusting entry when the alleged error was called to his attention, and included profit of about $9,000 of the Texas branch of petitioner's business. The credits made for 1942 profits took salaries and bonuses into account and did not include earnings of about $22,000 of the Texas branch. Under the agreement relied on by petitioner the key employees were to get one-half, yet they got more than that in 1941 and less than that in 1942. No evidence was offered on whether the key employees were or were not to share in profits of the Texas branch. Income from the Texas branch was first included, and then, for no reason apparent, excluded. That the alleged plan was not carried out in dividing the 1942 profits equally between petitioner and the key employees is otherwise shown by the manner in which the amounts were computed, recorded and reported for income tax purposes. Petitioner reported $146,257.93 as profit from his Oklahoma City business and supported the report by a schedule which agreed with the books of the company. General expenses of the business included office salaries of $9,125, including $5,200 as salary for Cooke, Jr., and $127,432.90 for "Employee's Profit Sharing *147 Plan." The credits, totaling $118,970.90, to the accounts of the key employees were made by deducting from $132,582.90, as representing 50 per cent of the profits, salaries and bonuses amounting to $13,675, which includes only one-half of the salary of $5,200 credited to Cooke, Jr., and deducted in the return. Thus the employees were paid and allocated the total of $13,675 less than the amount reported by petitioner. Hodges received no salary from petitioner other than a Christmas bonus of $750 but reported compensation totaling $5,180 from other sources. To include him in the alleged profit sharing plan for 1942 is contrary to the idea that it was based on services performed in earning the income. The amount of $127,432.90 claimed in petitioner's return as having been incurred under the profit sharing plan was computed in a different manner. The books of the Company disclose that the participants were Cooke, Jr., Ground, Hodges and DeLaughter. A critical analysis of the evidence discloses that in the case of Ground, Hodges and DeLaughter the amounts claimed as deductions for them were computed by adding to the credits to their accounts for profits the Christmas bonuses paid to them. *148 Cooke, Jr., who according to the books, received $51,783.16 under the plan (not including his salary) was not paid a Christmas bonus. To arrive at the amount reported by petitioner as paid to Cooke, Jr., there was added to his credit of $50,433.16 for profits the amount of $1,350, a figure equal to the total amount of $1,350 which the respondent found was paid as bonuses to petitioner himself and to shop employees. No contention is made by petitioner that he or shop employees were to participate in the plan as employees of the Company. Notwithstanding the method used in arriving at the various amounts DeLaughter testified that the entries were made "strictly in accordance with our agreement of the prior year." He also testified on two occasions that the books of the company reflected credits of $50,433.16 to the accounts of Cooke, Jr., and Ground for profits and $13,258.29 to the account of Hodges and his account, which, as pointed out, is contrary to the entries. DeLaughter testified that he prepared the returns of the key employees from the books of the Company and information given to him by them. The return of Cooke, Jr., reported $50,433.16 as his share of the profits. That figure *149 agrees with the entry made for his share of profits but disagrees with the deduction of $51,783.16 claimed in petitioner's return as part of the figure of $127,432.90. The figure $51,783.16 includes $1,350 for bonuses paid to petitioner himself and shop employees, and the $1,350 was not included in the return of Cooke, Jr. In the case of Ground the books show both $50,433.16, as reported in his return, and $46,058.16. In the case of DeLaughter the credit to his account was for $9,908.29 and the charge to make up the $127,432.90 figure was $11,958.29 but he reported $12,008.29 as his share of the profits. There is testimony that after the credits were made to the accounts of the employees they were notified that the amounts were subject to their demands at all times. Aside from payments of taxes on the amounts reported by the employees as income to them, no substantial amounts were charged to the accounts for withdrawals. Of about $182,000 credited to the accounts for 1941 and 1942 earnings, only about $8,400 was entered in the accounts for withdrawals prior to July 1, 1943, for other than taxes reported on the alleged income, notwithstanding the fact that in both 1942 and 1943 Ground *150 and DeLaughter claimed deductions in their returns for payments of interest. About 80 per cent of the total amount was withdrawn by petitioner's son. Failure of any of the employees to withdraw more than small amounts indicates that the amounts were not subject to their demands. We can not believe that these employees had the control contended for, yet left the funds practically intact, except for Cooke, Jr.'s drawings. The theory that they did so because of intent to invest in the partnership is inconsistent with Ground's testimony, as late as February 3, 1943, that he did not consider himself a partner - though the partnership was when formed dated from January 1, 1943, and the idea of partnership was not, in our opinion, so fixed at the time the credits were entered, as to explain why the employees spent almost none of the money. Cooke, Jr.'s account had an overdraft in it after the insurance premiums were charged to it in October 1942 and it continued to have a debit balance until the charge was eliminated in February 1943. All of the credit balances as of the close of 1942, except the one for Hodges, were absorbed by purchases for alleged contributions of capital to the partnership *151 and liabilities of the employees for state and Federal income taxes on the income they reported for 1942. Thus, except for the small amount in the case of Hodges, the employees had no amounts in 1943 out of 1941 and 1942 profits subject to withdrawal. DeLaughter testified that the credits for profits earned in 1941 would have been and could have been paid by the Company at the time they were made. The balance of the Company in its checking account at the Liberty National Bank did not have at any time in 1942 prior to May 31 a sufficient amount to pay all of the credits. The amount of other assets or credits to pay was not shown. Respondent points out, as evidencing petitioner's continued control over the funds credited, the fact that about $33,000 insurance premiums, on his life, were charged to Cooke, Jr.'s account. It is alleged by petitioner that they were charged to Cooke Jr.'s account in error, DeLaughter having made the entry without instructions from him. Petitioner testified before a special agent and revenue agent on February 25, 1943, that he had been discussing the matter of additional insurance on his life for about a year before the policies were issued. Testimony *152 before us is to the effect that a short time before he entered the military service in September 1942, Cooke, Jr., expressed a desire that the amount of profits to his credit on the books of the Company he invested in some form of quick assets, insurance on petitioner's life being mentioned among other investments, anf finally told petitioner to use his own judgment in the matter. Application for $20,000 of $45,000 worth of insurance taken out was applied for on August 26, 1942. It does not appear whether the alleged conversation of Cooke, Jr., took place before or after that application was made. The remainder of the insurance was applied for on October 7, 1942. Other testimony is that when the policies were received DeLaughter placed them in the safe without more examination than of the principal of the policies and the amount of the premiums; that when signing the checks, petitioner did not observe that they bore a notation that the amounts thereof were to be charged to the account of Cooke, Jr.; that DeLaughter, in view of the conversation between petitioner and his son, assumed that the policies were investments of the son's money and that the cost should be charged to him; that *153 DeLaughter was not instructed to charge the premiums to the account of Cooke, Jr.; that petitioner did not ascertain the alleged erroneous charge until the subject was taken up with him by DeLaughter in January 1943, which was after the entry had been discovered by Revenue Agent Young. The purchase of the insurance was an isolated transaction involving a large sum of money and therefore can not be regarded as a routine transaction in the life of petitioner. Petitioner testified before us that he did not sign many checks for the Company, that he examined the checks and knew the purposes for which they were drawn, and that he saw the "numbers" on the checks and "that's all." Each of the checks contained a typewritten notation to the left of the place provided for petitioner's signature that the amounts were to be charged to the account of Cooke, Jr. Other evidence is that petitioner did not instruct DeLaughter to charge the premiums to Cooke, Jr.'s account. DeLaughter testified before a special agent on February 6, 1943, that petitioner told him that he had given him definite instructions "not to charge those to Clint, Jr." Petitioner on brief refers to DeLaughter as a "faithful, efficient *154 and competent employee." An employee of such qualifications would have received definite instructions from his employer before making the original entry and would have notified him that the charge created an overdraft in the account of about $15,000. A charge to the account in December 1942 for a quarterly installment of Federal income tax on 1941 income increased the overdraft to about $17,500. To the extent of the overdraft, the policies were not an investment of any funds standing to the credit of Cooke, Jr. Cooke, Jr., was the primary beneficiary in $5,000 of the original insurance and in November 1942 he was named like beneficiary of $5,000 of the insurance in lieu of petitioner's wife. Under petitioner's theory of the case that petitioner's wife was named beneficiary of all of the insurance, some part of the premiums should have remained as a charge against the account of Cooke, Jr. It is significant that no adjustments were made in the account until after the revenue agent had discussed the charges with DeLaughter. Further discussion of the evidence on the point as to insurance appears unnecessary. Our conclusion from consideration of all of it is that petitioner either instructed *155 DeLaughter to charge the premiums to the account of Cooke, Jr., or was aware that they were to be charged to Cooke, Jr., and that he was thus exercising control over the amounts credited to Cooke, Jr., beyond any power given him by his son. The contention of petitioner that the plan was essential for the retention of his organization during dull business years and to act as compensation for periods when the employees served him for low salaries is contradicted by other evidence. Cooke, Jr., testified on direct examination that the services of Ground could not be measured in dollars and cents; that the amount Ground, Hodges, and DeLaughter received - wages, bonuses and share of profits - was inadequate and that it was "absolutely necessary" for petitioner to enter into the alleged profit sharing plan with the key employees. On cross-examination he testified that the compensation they received prior to 1940 was approximately the same as that paid in the sheet metal industry. Petitioner testified before Special Agent Roderick and Revenue Agent Hartson that he did not know what other contractors were paying for services similar to those performed by Ground, Hodges and Cooke, Jr., and *156 never discussed the subject with other contractors. His testimony before us on the point is evasive but to the same general effect. Petitioner's statement to the special and revenue agents that DeLaughter's position could be filled at the salary being paid to him is opposed to the idea that he was underpaid. The credits made out of 1941 profits were deducted as salaries in computing the profits of the Company and the employees in returns prepared by DeLaughter, represented the amounts as compensation for services. It was not until after the revenue agent commenced his examination of petitioner's return for 1941 that petitioner reported the amounts for 1942 as distributions of profits. The credits were not shown as liabilities in the financial statement of the Company prepared thereafter in 1943 as of December 31, 1942. Other contradictions of the testimony relied upon by petitioner are found in the instruments petitioner and the key employees executed in March 1943 to reduce their alleged understanding to writing. The effect of petitioner's testimony is that the profit sharing plan was to compensate the key employees for past service during the years when their salaries were inadequate. *157 The document provided in the case of Ground, Hodges, and Cooke, Jr., that the percentages of profit recited therein constituted compensation "at the end of 1941 and for the year 1942." The other instrument provided that the 5 per cent allocated to DeLaughter represented "compensation at the end of 1942." The first-mentioned instrument recites the beginning of 1941 as the time the verbal agreement was entered into, fixed the percentage of profits to be shared by Ground, Hodges and Cooke, Jr., and that the 5 per cent allocated to DeLaughter was agreed upon at the beginning of 1942. As already pointed out the percentages allocated Ground, Hodges and Cooke, Jr., on the basis of 1941 earnings, were not determined by petitioner until February 1942 and the percentages on account of 1942 profits were not determined until one year later. In addition to unanimity among the key employees with respect to lack of withdrawals of substantial amounts of the credits made to their accounts, the treatment of the book credits after the creation of the alleged partnership in 1943 is further indication that the amounts were never intended as payments for services or subject to the demands of the employees. *158 In determining the value of the Company for sale of interests therein to key employees in connection with the alleged partnership, the amount of $164,603.88 was included as an asset for value of profits in 1943 on jobs being carried out by the Associated Companies. Profits in the amount of $167,361.48 were received by the alleged partnership from the Associated Companies later during the year and reported as part of its income. Thereafter, in an amended return, the amount of $164,603.88 was eliminated from income of the alleged partnership and reported by petitioner as income to him from the Associated Companies, and the accounts of the alleged partners were charged with their share of the reduction of profits. The effect of the transaction was a charge of $82,301.94 against the credits of the key employees, for profits without their realizing any benefit when the asset ripened into cash. The charge left only about $74,000 of their total credits on January 1, 1943, and the tax reported in their Federal and state income tax returns was about $77,000, or about $3,000 in excess thereof. In addition thereto the key employees were liable to pay one-half of any profits of the Company which *159 were eliminated by renegotiation. Profits amounting to $50,000 were eliminated by renegotiation in 1944 and in 1948 when the elimination was paid, and accounts of the employees were charged with one-half of the net amount plus costs and interest amounting to $6,479.46 which was paid to the Government in 1948. The effect of these adjustments on the profits allegedly subject to the demands of the employees was to deny them full benefit of the credits. The account of DeLaughter illustrates the point. His account was credited with about $9,900, after adjustments for salary and bonus, on which income taxes were about $3,000. The charge made against it for income credited to petitioner from the Associated Companies was about $8,230 and the one for profits eliminated by renegotiation was about $2,800. The charges so made were about $4,122 in excess of the credit. There is no explanation in the evidence for not crediting the accounts of key employees with one-half of the profits realized in 1943 from participation as a member of the Associated Companies. If, as petitioner alleges, he had agreed to compensate them in proportion to the services they performed in earning profits, they should *160 have received some part of the income realized in 1943 for work done prior thereto. Instead, they not only did not realize anything from the allegedly binding agreement of petitioner to share the profits with them, but were charged with income retained by petitioner. The arbitrary action in the matter demonstrates his command over the income earned. Nothing of record shows that the key men agreed to this, except that DeLaughter made the entries, and filed the amended return. Though petitioner permitted his son and three employees to receive credit for about one-half of the profit reported by him, the actual cost to the petitioner (without considering other matters hereinbefore noted) by no means appears to be the amount of such credits. For 1941, computation of tax upon the net income reported by petitioner, and upon that amount plus the amount "distributed" in credits, discloses tax savings of about $42,306 as against about $63,228 distributed to son and key employees - a net cost to petitioner of about $21,922. The same figure for 1942 is about $14,595. Considering that in each year amounts greater than the last two figures went to the credit of petitioner's son, a family matter *161 and to be closely scrutinized, and the indications of control remaining in petitioner, there emerges explanation as to why the "distribution" in credits was made; for assuming that the employees actually received benefit of the credits, it becomes clear that petitioner by the plan benefited his employees very largely at the expense of the respondent, and with no expense to himself except by way of donation to his son, an intra-family affair, and even that with indication of control left in petitioner. Petitioner's treatment of the $164,603.88 profit indicates, so far as the record shows, control over the credits of the other key men. This consideration reflects strongly upon the reality of the transaction. The same is true of the fact that more than 50 per cent was actually credited to the key employees in 1941, and less than 50 per cent in 1942. The same is true also of the fact that though on petitioner's theory the credits for 1941 were to include salaries and bonuses paid, they were in fact an addition thereto, yet petitioner let the matter so stand. The amount involved was not small - about $15,000. This indicates disregard of the alleged agreement, and voluntary action in the *162 matter of the credits, by the petitioner. No useful purpose would be served in further discussion of the question. We have carefully considered all of the evidence and the contradictions therein. Quock Ting v. United States, 140 U.S. 417; Rosenberg v. Baum, 153 Fed. (2d) 10. Carmack v. Commissioner, 183 Fed. (2d) 1, citing O'Laughlin v. Helvering, 81 Fed. (2d) 269, and Rand v. Helvering, 77 Fed. (2d) 450, holds that the Tax Court is not bound to believe or to accept even uncontradicted testimony where such testimony appears highly improbable or manifestly unreasonable. See also National Weeklies, Inc. v. Commissioner, 137 Fed. (2d) 39; Greenfeld v. Commissioner, 165 Fed. (2d) 318; Robinson Truck Lines, Inc. v. Commissioner, 183 Fed. (2d) 739. We conclude that petitioner has failed to prove that he had a real agreement with his key employees to pay the amounts in question. Having disposed, as above, of the factual question as to prior agreement to divide the profits, we consider whether the amount of the credits to the key employees in 1941 and 1942 were reasonable. The petitioner *163 appears to brief the matter as conclusively settled by the question whether or not there was antecedent agreement for contingent compensation and to take the view that reasonableness of amount does not enter. We consider the argument overdrawn and that the cases cited do not bear it out. The matter, of course, stems from section 23 (a) (1) (A) of the Internal Revenue Code, providing for deduction of ordinary and necessary expenses of trade or business including "a reasonable allowance for salaries or other compensation for personal services actually rendered." Regulations 103, Section 19.23(a)-6, reads as follows: * * *
"(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprice, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by *164 any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. "(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned." Thus we see that "generally speaking" contingent compensation may be allowed though greater than the amount ordinarily paid; but we also see that "in any event" the allowance may not exceed what is reasonable under all the circumstances. No attack is made upon this regulation. We are, therefore, constrained to consider the facts here in the light thereof and to inquire whether under all the circumstances *165 the compensation paid to the key employees by the petitioner was reasonable. In Botany Worsted Mills v. United States, 278 U.S. 282, the Supreme Court considered amounts paid by a corporation to its officers upon a basis of percentage of earnings pursuant to a long standing agreement, rejected the idea that the expenses were "ordinary and necessary expenses" within the meaning of the statute "merely because the payments are made in accordance with an agreement," said that "even if binding upon the parties, such an agreement does not change the character of the purported compensation or constitute it, as against the Government, an ordinary and necessary expense," and disallowed the amounts, upon the evidence. Botany Worsted Mills v. United States, supra, was followed in Cohen v. Commissioner, 31 Fed. (2d) 874, where it was concluded that amounts paid to sons of the taxpayer, pursuant to contract made in a previous year, were deductible as ordinary and necessary expense "being a reasonable allowance for compensation paid for services actually rendered." It is clear that such reasonableness is the ratio decidendi, and not the mere fact of contract *166 in a previous year. Somewhat similar to the position of Cooke, Jr. here, the sons had been working in a father's business. They were dissatified and were promised additional compensation, not to be paid to them forthwith but credited upon the books subject to certain contingencies. The regulation provides that we take into consideration the circumstances when the contract for services was made. Therefore, even if we were to assume that there was, during the period beginning about 1936, something in the way of arrangement for contingent compensation for the key employees, the reasonableness of the amounts is to be weighed in the light of the then circumstances, and all circumstances. This we have done, as we did in California Vegetable Concentrates, Inc., 10 T.C. 1158, where the contract for services was contingent and entered into in a prior year. In Hoffman Radio Corp. v. Commissioner, 177 Fed. (2d) 264, the circuit court considered a case where in a prior year a corporation had agreed to pay the president an amount equal to 3 per cent of its gross sales and thereafter because of war conditions abnormal sales were made and he was paid about $63,000. The *167 court upheld the holding of The Tax Court of the United States of only $40,000 as a reasonable deduction for compensation. It had been pointed out that the contract was on a contingent basis, that the petitioner's primary contention was that the agreement was fair and reasonable when made considering the circumstances attending its execution; therefore that the petitioner was entitled as a matter of law to deduct the full compensation paid, the argument being predicated on Regulations 111, Section 29.23(a)-6. Referring to the language of the regulation that "in any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances," with other language of the regulation as above quoted, the court held that the regulation considered in its entirety did not "establish the hard and fast rule that a contingent contract, fair and equitable when made, becomes permanently immune from scrutiny regardless of how radically conditions may alter." Petitioner had erected his proposition on the last sentence of the regulation, stating that the expenses to be taken into consideration were those when the contract was made, not when it was questioned, but the *168 court holds that the key provision of the regulation is the statement that "in any event the amount of the compensation may not exceed what is reasonable considering all the circumstances." [Italics supplied.] The court sustains the Tax Court in its holding that the business done in 1943, the taxable year, was attributable in the main not to the services but to war conditions and holds that the reduced allowance should be upheld. The Hoffman Radio case, supra, cites Miller Mfg. Co. v. Commissioner, 149 Fed. (2d) 421. There a resolution for additional compensation was adopted in 1920, providing payment to officers of one-half of net earnings above $52,000. Similar resolutions were later adopted, but, because profits did not permit, the additional compensation was paid in only five years prior to 1940 and 1941, the taxable years involved. Though the general question of effect of the contingent agreement is not discussed, the court considered "unusual war contracts and exceptional economic conditions" and upheld the Tax Court in its finding of "reasonable compensation" in amounts much less than those paid. In Connecticut Marine Boiler Works v. Secretary Maritime Commission, 16 T.C. 339, *169 we considered reasonableness of salaries contingent in nature and allegedly, in part, to recompense for insufficient earlier compensation; but we held that all circumstances must be considered, both those at the time compensation was agreed upon and those at the time compensation was paid. In the instant case we have before us 1941 and 1942, involving not merely war conditions but large earnings from war contracts, so that there can be found no difference in principle from the cases just above cited. Under all of the evidence, and even assuming that there was some talk, from 1936, of better compensation in the future for the key employees, we do not find that the Commissioner is shown to have erred in his denial of the deduction of the amounts credited, on the ground that they wer not shown to be reasonable compensation for the services rendered, in addition to the salaries and bonuses otherwise paid. It is to be noted here that for 1941 the salaries and bonuses were not deducted by the parties in setting up the amounts credited to the key employees, so that their distributions were in addition to such salaries and bonuses, and that, though in setting up the distributions for 1942, *170 the salaries and bonuses were first taken out, the Commissioner in both years allowed the salaries and bonuses (except petitioner's $1,175 bonus to himself in 1942); and it is also to be remembered that under the evidence the salaries paid were commensurate with those paid for like services by other like organizations. Petitioner himself did not know what his competitors were paying. In his words it was "no concern of mine at all." The comparison can not be disregarded, nor the matter be placed entirely upon agreement as contended. Reasonableness of the salaries is not established by a view that they be considered for services over a period of years from 1936, and not merely for 1941-1942. Such view is not borne out by the evidence. The credits for 1942, indeed, were specifically labeled as for that year. Though as to 1941 this does not aupear, other circumstances oppose such theory. In 1936 Cooke, Jr., was 21 years old and in 1937 his salary was $900 as against $2,080 for Ground. He received no compensation for 1936. Under the evidence his services were similar to those of Ground. Yet the proportion of the credits which is proposed for him is the same as that of Ground, who had been *171 with the organization since 1933. DeLaughter was employed only from 1939, yet for 1942 both he and Hodges received the same amount of credit, though Hodges had been employed long before DeLaughter. Moreover, in the absence of evidence that the employees were underpaid in the years prior to the taxable years, payment could not be deducted in the taxable years. Lydia E. Pinkham Medicine Co. v. Commissioner, 128 Fed. (2d) 986. See also Pantages Theatre Co. v. Welch, 71 Fed. (2d) 68. The evidence is that the salaries actually paid in 1936-1942 were comparable with those paid by other like organizations. Therefore, even considering the credits of 1941-1942 prorated over 1936-1942, they are seen to be additions to ordinary or reasonable compensation, so that petitioner's position must rest upon the alleged agreement alone, and not upon reasonableness in amount. This it can not do. We note that petitioner assisted in setting the salaries to be paid to the key men of the Associated Companies, an indication that the amounts set were by him considered reasonable; yet the credits here involved, to his own key employees, were in addition thereto. Under all of the *172 circumstances, we find no error in the Commissioner's denial of the deductions above the amounts paid for salaries and bonuses. Petitioner however also contends that if for any reason the amounts credited to the key employees for profits are not deductible as business expenses, looking to substance rather than form, the alleged plan he had was a joint adventure which required him to distribute 50 per cent of the profits to the employees "on a reasonable basis as between themselves." This contention of petitioner, necessarily in the alternative, is advanced for the first time upon brief. Counsel for petitioner remarked in his opening statement at the hearing that the alleged profit sharing plan "amounted to an agreement which partook of the nature of a joint enterprise, though not being a joint enterprise because it was the Cooke business." The quoted language is relied upon as announcing that the arrangement "amounted in law to a joint adventure or 'common enterprise'." We are unable so to construe the meaning of the opening statement relied upon. We think it amounted rather to a statement that there was no joint enterprise because petitioner never relinquished the business; but *173 that there was something in the nature of "common enterprise," to be considered in deciding whether the expense was deductible. We do not regard this as raising the issue of joint adventure. In any event, the argument is based upon the existence from 1936 through 1942 of an alleged agreement, enforceable under Oklahoma law, to share profits earned by the Company in 1941 and 1942. The implication of petitioner's discussion of the question on brief is that he and the key employees participated in a joint adventure without any thought that they were joint adventurers. Petitioner admits that one of the characteristics of a joint adventure is a venture in which profit is jointly sought. The evidence relied upon to support the contention is the same as that cited to establish a basis for deducting the credits to key employees as business expenses. We concluded from careful consideration of all of it that it did not establish an agreement to pay the amounts in question. Our conclusion is the same under this issue. Respondent concedes on brief that petitioner is entitled to additional deductions in 1942 for compensation paid to Ground and Hodges in the amounts of $1,571.25 and $750, respectively, *174 and $39,289.55 on account of renegotiation of profits for that year. The concessions will be reflected in the recomputation under Rule 50. Partnership In connection with his contention that a valid partnership existed in 1943 for tax purposes, petitioner alleges that as early as 1936 he gave a promise to Ground and Cooke, Jr., that he would take them into the business; that thereafter it was extended to include Hodges and DeLaughter; that about September 1, 1942, all of them tentatively agreed to form the partnership for the operation of the business after January 1, 1943; and that in December 1942 the arrangement was again discussed and agreed to. He asserts that the evidence meets all of the tests required by Commissioner v. Tower, 327 U.S. 280, Lusthaus v. Commissioner, 327 U.S. 293, and Commissioner v. Culbertson, 337 U.S. 733 for a bona fide partnership. Petitioner seems to be of the opinion that if the arrangement meets the test of local law for a valid partnership, it should be recognized by the Federal Government for tax purposes. That the question is not governed by how the arrangement would be treated under the law of Oklahoma *175 is settled by the Tower case. The Supreme Court said in the Culbertson case that "* * * The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case, but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" Was an oral agreement entered into in 1942 as alleged by petitioner for the operation of the business as a partnership? On this point, as in the case of the matter of agreement for the sharing of profits in 1941 and 1942, the evidence is not only confusing but has numerous contradictions. There is some testimony before us to establish a verbal understanding or agreement in 1942 to form a partnership. *176 Ground first testified that he could not recall when the key employees started to discuss the matter of forming a partnership and then that in 1937 or 1938 petitioner led him to believe that they would be partners in the business "in later years" and that discussion of terms of a partnership did not take place until the latter part of 1941. The testimony discloses no more than discussion of the subject which is short of an agreement. Supporting the inference of Ground's testimony that no agreement was entered into in or prior to 1942, as alleged by petitioner, is a statement appearing in his testimony before Special Agent Roderick and Revenue Agent Young on February 5, 1943, in which, in response to a question of whether he then considered himself to be an employee of the Company or a partner in the business, he said that he was an employee and did not consider himself a partner of petitioner. Hodges was not questioned with respect to any discussion with petitioner or others about the formation of a partnership. The witness stated in the affidavit he gave Special Agent Roderick on February 3, 1943, that he had been employed by C. C. Cooke Company since 1928 and that on several occasions *177 during "the past ten years" petitioner had informed him and Ground that it was his intention to have them "become partners in his business whenever his business became sufficiently profitable." Cooke, Jr., testified that the formation of a partnership at some time in the future was discussed at least four or five times each year between 1936 and 1941, inclusive, by him, Ground, Hodges and Leister and petitioner. Thereafter he testified that about September 1, 1942, he and the other key employees in a discussion with petitioner said that a partnership should be formed; that they discussed "the fact that if and when I became a member of the partnership that my earnings should go on"; that all agreed to leave the credits in their accounts for use in acquiring their interests; and that it was tentatively agreed that the partnership would be effective for 1943. Other testimony by him is that he knew nothing more about the formation of a partnership until articles of co-partnership were sent to him in March 1943 for signature. The affidavit Cooke, Jr., gave Specal Agent Gulley on February 24, 1943, makes no reference to discussion or agreement to form a partnership at that time. DeLaughter *178 testified that prior to 1942 there was general discussion that petitioner wanted the key employees "to come into his business later on"; that during a discussion about September 1, 1942, in which all of them participated according to his recollection, petitioner expressed the opinion that as soon as current projects were carried out or after that year's work was completed, the group should be bound together in a company and that all agreed that "was a plan that we should follow." Further questioning developed testimony from DeLaughter that a tentative agreement was reached that their interests in the partnership should be the same as their participation in profits of the Company; that there was discussion of the value of the business; and that the partnership should be formed after the results of the jobs completed in that year became known. Thereafter he testified to discussions about Christmas 1942, not participated in by Cooke, Jr., that "We should be ahead with our plans to formulate the partnership"; that "Along in February 1943" the value of the business was determined and agreed upon and agreements were reached on the interest each was to hold and duties of partners as members *179 of the partnership. According to this testimony there was an oral agreement not later than the close of 1942 for the operation of the business as a partnership and that the interests of the members were tentatively fixed as early as September 1942. DeLaughter informed a revenue agent on February 9, 1943, that the interests of key employees in profits for 1942 which were to measure their alleged interests in the partnership were not fixed by petitioner at that time, i.e., February 9, 1943. Petitioner first testified that the possibility of a partnership was discussed with the key employees during the period from 1936 to 1942, inclusive, and then that "We had discussed it several times before that," referring to conversations before Cooke, Jr., entered the military service in September 1942; that when the subject was discussed in September 1942 that he requested DeLaughter to determine the book value of the business; that "We was determined to set up a certain percentage as we had heretofore given them as their part of the partnership"; that they wanted to pay for their interests out of credits made in their accounts for profit and that statements were made to form a partnership effective *180 January 1, 1943. Other testimony of petitioner infers that the division of profits of 1942 among the employees was not determined by him until after the profits of that year had been determined, which was in February 1943. Petitioner testified before Special Agent Roderick and Revenue Agent Hartson on February 25, 1943, that "It has always been my intention to turn this business over to those three boys [Ground, Hodges and Cooke, Jr.] which is understood between us. Mr. Hodges is to go to San Antonio, Texas, with the Texas firm and Mr. Ground and my son are to take over the Company at the close of the war and they thought it best to leave these amounts in there for the future financing of the business." The testimony of petitioner before this Court is that an understanding was reached in September 1942 for the creation of a partnership, effective at the beginning of 1943, to include all of the key employees. His testimony before the special agent and revenue agent does not include Hodges or DeLaughter as members of a partnership to operate the business in Oklahoma City. The evidence in the record does not establish an oral agreement prior to 1943 for the formation of the partnership, *181 as alleged by petitioner. That a written agreement was entered into in March 1943 for the formation of a partnership is not decisive, such agreement of the parties being only a factor to consider in determining the intention of the parties. The actions of the parties thereafter have a reflection upon their true intent at the time of the execution of the agreement. Although under petitioner's theory of the case an oral agreement to create a partnership was entered into in December 1942, effective at the beginning of the next year, and a written agreement was entered into in March 1943, as late as July 1943 the bank and others were not notified of the change of method of conducting the business. The formation of a partnership was not publicized until the last of July 1943, and book entries for the change were not entered until September 1943. No explanation was given for the long delay. Belief of petitioner as expressed to DeLaughter that notice would operate against his good credit standing indicates lack of good faith in entering into the new enterprise. The provision made for contribution of capital by key employees converted liabilities of the sole proprietorship into assets *182 of the partnership and served to improve, rather than impair, the financial standing of the business. No proof was made that capital or investment accounts were opened for the alleged partners. The facts before us infer the contrary. The accounts of the key employees contained entries which included the closing balance for the prior year, charges for purchase of alleged interests in the assets of the Company, income taxes, withdrawals, and credits for shares of profits of the partnership. The accounts of Ground, Cooke, Jr., and DeLaughter were charged with amounts for the alleged purchase in excess of the amounts specified in the agreements and no proof was made that they consented to or were aware of the excessive charges, except that DeLaughter knew about the entries. Neither was proof made that the key employees gave petitioner notes for the unpaid purchase price of their interests, as required by the agreements they signed. Other evidence of lack of reality is found in the agreements whereby the key employees assumed liability to share in loss of profits from renegotiation proceedings. The profit eliminated in 1944 by renegotiation and ultimately paid in 1948 was earned by *183 petitioner as a member of the Associated Companies. Potential liability for the excessive profits existed when the net value of petitioner's business was determined in 1943 and was recognized. With knowledge that such liability existed, parties, if dealing at arm's length, would have reasonably provided for a reduction in the value of the net assets or taken other measures to insure that any payment under the liability would fall on the person who had realized the excessive income. To the extent of this liability the key employees were charged a price for net assets in excess of their value. Other and perhaps greater disregard of the rights of partners, to the financial benefit of petitioner in violation of the terms of the written partnership agreement, is seen in the manner in which the partnership treated the profits received in 1943 from participation by petitioner in the Associated Companies. These profits, amounting to about $165,000, were retained by petitioner in spite of the fact that they were included as an asset of the business when the employees allegedly acquired interests therein. If the parties had agreed that the earnings would be paid to petitioner, arm's length *184 dealings would have provided for a corresponding reduction in the purchase price of interests in the business. The effect of the transaction was, as already pointed out, a charge to key employees of about $82,500 for anticipated profits for services already performed, without any right to participate therein when the income was realized. The right to profits was used by petitioner as part of his cost of assets sold and he not having reported the earnings as income to him, his cost was overstated by that amount. If respondent had adjusted petitioner's cost basis, the result would have been a gain of about $165,000 on the sale. Respondent made no adjustment in the cost basis and did not otherwise disturb the manner in which petitioner reported the sale. None seems to have been necessary in view of the fact that respondent treated the partnership as a sole proprietorship in 1943 and petitioner in an amended return reported the profits from the Associated Companies as taxable to him. The amount was eliminated as income of the partnership in an amended return and the distributive shares of the alleged partners reflected the adjustment. DeLaughter filed an amended return to report the change *185 but it does not appear in the evidence whether like returns were filed by Cooke, Jr., Ground and Hodges. No cash was contributed to the partnership by any of the key employees. They contributed to the partnership the interests they had acquired from petitioner. The interests so acquired were payable in part out of credits to their accounts for profits in 1941 and 1942 and the remainder was to be evidenced by notes payable only by an application of 75 per cent of the profits distributable to them as partners. If we are right under the primary issue in 1941 and 1942, the employees had no credits, subject to their unfettered command, to use to pay for interests as contributions of capital. No proof was made that the notes were executed. If so, being payable only out of profits of the partnership, no full liability was assumed to pay them. Cooke, Jr., entered military service in September 1942 and was not available for full time service to the partnership in 1943. There is no proof that he performed any services for the partnership in 1943. DeLaughter testified that while Cooke, Jr., was stationed at "Gainesville" he was available for conferences during week ends and that "Exclusive *186 of the time he was in the service he was giving all of his time to the Company," the partnership. Cooke, Jr., testified that while he was at Camp Houston "We had some jobs going on at Gainesville. What time I could I visited those jobs," and that during that time he was "constantly in touch with the business activitities" of his "father's" business. Nothing in this testimony establishes performance of service for the partnership in 1943. That Cooke, Jr., had reference to his availability for services prior to 1943 is shown by the fact that he confined the period to the time when his father was operating the business. Consideration of all of the evidence in the light of the Culbertson case leads us to conclude that the parties did not in good faith intend to become partners for the operation of the business. It follows that respondent did not err in taxing all of the profits of the business in 1943 to petitioner. The respondent concedes on brief that petitioner is entitled to a deduction of $16,275 in 1943 for salaries of key employees in the event it is held, as we have held, that the partnership is not recognizable for tax purposes in that year. The concession will be reflected *187 in the recomputation under Rule 50. Bad Debt Respondent contends, in addition to other grounds for sustaining his action on the bad debt question, that the evidence offered under the issue does not establish the existence of a valid debt. The deduction, according to the statement attached to the deficiency notice, was claimed as a debt owed by the Tankersley Construction Co., it not appearing whether the partnership or the corporation, its successor, was considered to be the debtor. The proof here is that amounts were charged to Dan Tankersley and the Tankersley Construction Co. and that the individual assumed the debts of the partnership when the corporation was organized, the time of its creation not being shown. A debt existed, and under the circumstances prevailing here, we can find no grounds for not making a decision on the merits. The applicable statute allows as deductions "Debts which become worthless during the taxable year," section 23 (k) (1), Internal Revenue Code. The grounds for the charge off of the debt as worthless in 1941 were a statement of Dan Tankersley that neither he nor the Tankersley Construction Co. owed the amount and, accordingly, *188 would not pay the debt and a belief that collection might be barred by the statute of limitations. More than a refusal of a debtor to pay and the petitioner's belief on the running of the statute on collection, involving, as it does, the further question of whether the debtor would plead the statute as a bar, is necessary to prove worthlessness of an account for deduction purposes. Boehm v. Commissioner, 326 U.S. 287. On brief petitioner asserts that the Tankersley Construction Co. had virtually no business and no assets in 1941. There is no evidence before us on the financial inability of Dan Tankersley or the Tankersley Construction Co. to pay the debt during the taxable year. Without any evidence on the point and assuming, without deciding, that the account had value at the beginning of 1941, we are unable to conclude that the debt became worthless during that year. Accordingly, we sustain the respondent on this issue. Traveling Expense In connection with this disallowance of $1,800 of the $2,400 claimed by petitioner in his return for 1943 for traveling expenses, the respondent adjusted depreciation by disallowing the amount of $34.62 claimed on an automobile. *189 The action of the respondent was assigned as error. No evidence was offered by the petitioner on the issue and it was not discussed on brief. Under the circumstances the action of respondent with respect to disallowance of deprication will not be disturbed. The difference between the parties on the issue relating to traveling expenses is whether petitioner is entitled to a greater allowance than the amount of $600 allowed by the respondent in his determination of the deficiency for 1943. Petitioner is asking that we allow the full amount of $2,400 claimed by him. The burden was on petitioner to prove that he is entitled to deduct an amount in excess of respondent's allowance. Petitioner argues on brief that a great portion of 1943 was spent by him in the supervision of a job in Tulsa, Oklahoma. Petitioner's testimony, there being none other offered under the issue, is only that upon completion of the project at Camp Gruber about May 1, "* * * we had to go down into Texas, Delhart [Dellhart], distant places away, to try to secure jobs to keep our organization together." He kept no record of his expenditures and merely estimated the amount to be $2,400 in accordance with, as he *190 testified, estimates for prior years. Only the amount of $2,122.92 was claimed as traveling expenses for his entire business in 1941 and $943.17 for the business and $1,252.32 for himself as the amount for which he did not obtain reimbursement, in 1942. The deductions claimed for 1941 and 1942 are opposed to his testimony that he spent $2,400 or more in those years. No explanation was given for his alleged inability to obtain reimbursement from the partnership for expenses claimed as a deduction. The testimony of petitioner that he spent $2,400 or more in 1943 is a mere estimate, unsubstantiated. He kept no records on the matter. Such testimony is not enough to overcome the presumptive correctness of the respondent's determination. Louis Halle, 7 T.C. 245 affd., 175 Fed. (2d) 500; Hoefle v. Commissioner, 114 Fed. (2d) 713. In the cases cited by petitioner we were able to find from the evidence that the amounts were actually spent for traveling. The basis for the deduction here is an estimate of petitioner. Respondent recognized the deduction claimed by allowing one fourth of the amount or $600. His action in that regard is supported by the *191 rule announced in Cohan v. Commissioner, 39 Fed. (2d) 540. We find nothing before us to justify a different result here. On this issue we sustain the respondent. Loss on Farm The difference between the parties on the loss question is whether the operation of the farm constituted a business of petitioner. The respondent determined that the operation was for pleasure. Petitioner on brief contends that the uncontradicted evidence is that the venture was entered into for the sole purpose of realizing profit by sale of chickens and their products and that the entry of game cocks in tournaments was not a part of his business other than to advertise the product he had for sale. The parties are in agreement that if gain was the primary motive of the petitioner in the operation of the farm, the loss was sustained in the conduct of a business for tax purposes. The only testimony on the issue is that of petitioner. He testified that the purpose of the venture was "to make money." The testimony has little, if any, probative value. It represents no more than the conclusion of an interested witness, which he, in effect, expressed to the Commissioner in his return and which *192 the latter declined to follow. The function of this Court is to resolve the issue in the light of all the evidence applicable to the question. The expressed intent of petitioner may be rebutted by circumstances inconsistent therewith, which exist here. Tatt v. Commissioner, 166 Fed. (2d) 697. Petitioner acquired an interest in the farm in 1941 or 1942. When asked on direct examination whether he made "any money in the early years" from the operation of the farm, he replied, "No. Maybe some years, maybe some I wouldn't. The last year I made some money." In response to the next question, he testified that he could not say how many years he made a profit and that "I imagine most of the years I made a profit." The income tax returns filed by the petitioner for 1941 and 1942 contain nothing about the operation of the farm in these years. The absence of any reference in the returns to the operation of the farm indicates that the petitioner considered the operation of the plantation to be a non-business venture. Petitioner's contention is based in part upon proof that products of the chickens were sold. Petitioner testified that the hens laid eggs like other chickens but *193 nothing was offered to show that any of the eggs were sold. That eggs were not sold is indicated by the absence of any amount in the return from that source. Another basis is alleged proof that cock fighters were entered in tournaments once a year for advertinsing purposes. Petitioner testified that he entered fowl in the tournaments "probably about four times a year just to show our fowls." Nothing was deducted in the return for entry fees although $750 was reported as income from a purse at Tallahassee. Petitioner also testified that he advertised the chickens in all of the game fowl journals, about four in number, but the return, filed on an accrual basis, contains no deductions for advertising expense. The testimony is that the average price received for each chicken was $15. Based upon sales amounting to $1,055 for 1943, petitioner sold about 70 chickens in that year. Operating expenses in 1943 were reported to be $4,550, or about $65 for each chicken actually sold. Nothing was offered to show that expenses were higher in 1943 than in prior years or that in other respects 1943 was an abnormal year for earnings. Other testimony of petitioner is that he sold the plantation in *194 1943 "and moved my fowls out here on another tract." On brief he alleges that the loss was sustained "before I removed that business from Florida." The sale of the plantation was not reported by petitioner in his return for 1943 and depreciation was claimed on the basis of acquisitions on January 1, 1943, and a full year of use. Thus, the return implies that nothing was sold in 1943, that the property on which depreciation was taken was acquired on January 1, 1943, and not in 1941 or 1942 as testified by petitioner, and that the operation was conducted on Lawridge Plantation throughout 1943 as sole owner, contrary to testimony of petitioner that he acquired a one-half interest. Under the circumstances, and the selfcontradictorry record, we are unable to find that petitioner has sustained his burden of proof. Accordingly, we hold for the respondent on this issue. Fraud Respondent's contention that the returns of petitioner in the taxable years were false or fraudulent with intent to evade tax is based, in general, upon the theory that the credits made to the accounts of key employees for a portion of the earnings of the Company in 1941 and 1942 were for the purpose of evading *195 taxes and that the partnership agreement was entered into in 1943 in an effort to give substance to the alleged profit sharing plan for the earlier taxable years, and had a like motive. The crux of the argument of petitioner is the same as that made for recognition of the credits as business expense deductions and the partnership as a valid enterprise for tax purposes. Under this issue, respondent, instead of having a presumption of correctness to be overcome by petitioner, under the statute had the burden of proof. Fraud will never be presumed except under circumstances "not fairly susceptible of any other interpretation." Tucker v. Moreland, 35 U.S. 56. Its existence must be shown by more than a mere preponderance of the evidence and the proof must be by clear and convincing evidence. George L. Rickard, 15 B.T.A. 316; M. Rea Gano, 19 B.T.A. 518; National City Bank of N. Y. v. Helvering, 98 Fed. (2d) 93, affirming 35 B.T.A. 975; Budd v. Commissioner, 43 Fed. (2d) 509; Rogers v. Commissioner, 111 Fed. (2d) 987; Griffiths v. Commissioner, 50 Fed. (2d) 782. "* * * The fraud meant *196 is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. * * *" [Mitchell v. Commissioner, 118 Fed. (2d) 308.]
William W. Kellett, 5 T.C. 608, 618. The failure of petitioner to prove before the Court the existence of a real profit sharing plan and partnership for tax purposes does not require a finding of fraud. More than doubt is required of respondent under the burden he had. Arthur M. Godwin, 34 B.T.A. 485. There was no concealment of the profit sharing plan or the formation of a partnership. While the return for 1941 did not isolate the additional compensation paid as resulting from an employee's profit sharing plan, as labeled in the return filed for 1942, the books of the Company contained entries for the amounts to support the deduction. That the formation of a partnership was not given publicity and recorded in the books of account more promptly, was not fraud against the Government. The financial statement prepared in February 1943 on the basis of a sole proprietorship falls in the same classification. The operation of the business under an agreement for a partnership *197 was disclosed to the Government as soon as it became important for income tax purposes. All of the credits, together with shares of profits of the partnership, were fully reported for income tax purposes, and tend to negative a deliberate purpose to evade taxes. Lorenzo C. Dilks, 15 B.T.A. 1294; George W. Griffiths, 37 B.T.A. 314. That it resulted in less tax than would have been payable if petitioner had reported all of the income as his own, avails respondent nothing here without proof of a fraudulent motive. He gave DeLaughter directions in 1941 to inquire into his legal right to deduct the amounts from income. The facts contain evidence that petitioner had his bookkeeper's advice as reason for believing that a profit sharing plan with his key employees would meet the conditions of the statute for business expense deduction purposes. If tax avoidance was his sole objective, his actions were not fraudulent. Court Holding Co., 2 T.C. 531; Rogers v. Commissioner, 103 Fed. (2d) 790. The evidence shows, as respondent admits, that petitioner cooperated with his agents in the various investigations that were conducted to determine *198 petitioner's tax liabilities. We conclude from a consideration of all of the evidence that respondent has failed to prove that the returns for the taxable years were false or fraudulent with intent to evade tax. Decision will be entered under Rule 50. Footnotes
1. Loss.↩
1. Records not available to show salary paid prior to 1937.↩
1. Exclusive of Leister; any compensation paid to or profits distributed to him not being in controversy here. Any reference hereinafter made to key employees will not include Leister.↩
1. Includes notes receivable for $800. ↩
2. Includes $3,750 for Government bonds and $1,468 for automobile and excludes insurance premiums.↩
1. Reported as income from profit sharing plan.↩
1. These amounts and $58,657.24, applicable to Ground, were the credit balances in the drawing accounts of the respective key employees on January 1, 1943, and in the case of each individual, except Hodges, is equal to the total of the credit application and tax reported in Federal and state income tax returns for 1942. In the case of Hodges the credit balance was $1,353.01 in excess of the total of the amounts.↩